**UNITED STATES of America,**
**Appellant,**

v.

**James Mitchell NEWMAN,**
**Defendant-Appellee.**

**No. 1728, Docket 81–1225.**

United States Court of Appeals,
Second Circuit.

Argued July 17, 1981.

Decided Oct. 30, 1981.

Rehearing and Rehearing In Banc
Denied Dec. 30, 1981.

John S. Martin, Jr., New York City, U. S. Atty., S. D. N. Y. (Lee S. Richards and Mark F. Pomerantz, Asst. U. S. Attys., New York City, of counsel), for appellant.

Franklin B. Velie, New York City (Gordon Hurwitz, Butowsky, Baker, Weitzen, Shalov & Needell, David M. Butowsky, Theodore Altman, Paul D. Wexler, New York City, and Kenneth S. Gerstein, of counsel), for defendant-appellee.

Paul Gonson, Sol. S. E. C., Washington, D. C. (Michael K. Wolensky, Associate Gen. Counsel, Donald C. Langevoort, Sp. Counsel, Richard M. Starr, Washington, D. C., of counsel), for S. E. C. as amicus curiae.

Before VAN GRAAFEILAND and NEWMAN, Circuit Judges, and DUMBAULD,* District Judge.

VAN GRAAFEILAND, Circuit Judge:

The United States appeals from an order of the United States District Court for the Southern District of New York which dismissed an indictment charging James Mitchell Newman with securities fraud, section 10(b) of the Securities and Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b–5 (17 C.F.R. § 240.10b–5), mail fraud, 18 U.S.C. § 1341, and conspiracy to commit securities and mail fraud, 18 U.S.C. § 371. The district court dismissed the securities fraud charge because it concluded that "there was no 'clear and definite statement' in the federal securities laws which both antedated and proscribed the acts alleged in [the] indictment" so as to give the defendant a reasonable opportunity to know that his conduct was prohibited. The district court held that the allegations of mail fraud failed as a matter of law to charge a crime. The conspiracy count, the district court said, fell with the two substantive counts. We reverse.

---

* Of the Western District of Pennsylvania, sitting by designation.

Although the indictment names appellee Newman and E. Jacques Courtois, Jr., Franklin Carniol, and Constantine Spyropoulos as defendants, only Newman was within the jurisdiction of the district court and a party to the proceedings below. The allegations of the indictment refer to all defendants, however, and, for purposes of this opinion, we assume the following summary of facts to be true. *See United States v. Von Barta*, 635 F.2d 999, 1002 (2d Cir. 1980), *cert. denied*, 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981).

Morgan Stanley & Co. Inc. and Kuhn Loeb & Co., now known as Lehman Brothers Kuhn Loeb Inc., are investment banking firms which represent companies engaged in corporate mergers, acquisitions, tender offers, and other takeovers. From 1972 to 1975, Courtois and an alleged but unindicted co-conspirator, Adrian Antoniu, were employed by Morgan Stanley. In 1975, Antoniu left Morgan Stanley and went to work for Kuhn Loeb. Between January 1, 1973 and December 31, 1978, Courtois and Antoniu misappropriated confidential information concerning proposed mergers and acquisitions that was entrusted to their employers by corporate clients. This information was conveyed surreptitiously to Newman, a securities trader and manager of the over-the-counter trading department of a New York brokerage firm. Newman passed along the information to two confederates, Carniol, a resident of Belgium, and Spyropoulos, a Greek citizen who lived in both Greece and France. Using secret foreign bank and trust accounts and spreading their purchases among brokers, all for the purpose of avoiding detection, the three conspirators purchased stock in companies that were merger and takeover targets of clients of Morgan Stanley and Kuhn Loeb.[1] They then reaped substantial gains when the mergers or takeovers were announced and the market price of the stocks rose.

These profits were shared with Courtois and Antoniu, the sources of the wrongfully-acquired information.

We believe that these allegations of wrongdoing were sufficient to withstand challenge in all three counts.

### THE SECURITIES FRAUD

■ In preparing the indictment, the Government attempted to remedy a deficiency that led to the Supreme Court's reversal of a conviction in *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). In that case, the defendant secured confidential information concerning proposed corporate takeovers through his position as a mark-up man in a financial printing establishment doing work for companies planning takeovers. He, too, prospered by purchasing stock in target companies. His conviction for section 10(b) and Rule 10b–5 violations was affirmed by this Court, *United States v. Chiarella*, 588 F.2d 1358 (2d Cir. 1978) but reversed by the Supreme Court because that Court found no fiduciary relationship between Chiarella and the sellers of stock which imposed upon him a duty to speak. 445 U.S. at 231–35, 100 S.Ct. at 1116–18.

The thrust of the Government's case in *Chiarella* was that the defendant violated section 10(b) and Rule 10b–5 by failing to disclose material, non-public information to the shareholders of target companies from whom he purchased stock. *Id.* at 236, 100 S.Ct. at 1119. As the Court observed, "[t]he jury was not instructed on the nature or elements of a duty owed by petitioner to anyone other than the sellers." *Id.* To remedy the deficiency in *Chiarella*, the Government here has pointed its charge of wrongdoing in a different direction. The indictment charges that Courtois and Antoniu breached the trust and confidence

---

1. In two instances the targets themselves were clients of the investment banking firms. The Government belatedly suggests that the indictment should be construed to allege securities laws violations in these two instances, on the theory that the defendants, by purchasing stock in the target companies, defrauded the shareholders of those companies. Whatever validity that approach might have, it is not fairly within the allegations of the indictment, which allege essentially that the defendants defrauded the investment banking firms and the firms' takeover clients.

placed in them and their employers by the employers' corporate clients and the clients' shareholders, and the trust and confidence placed in Courtois and Antoniu by their employers. The indictment charges further that Newman, Carniol, and Spyropoulos "aided, participated in and facilitated Courtois and Antoniu in violating the fiduciary duties of honesty, loyalty and silence owed directly to Morgan Stanley, Kuhn Loeb, and clients of those investment banks." The indictment also charges that Courtois, Newman, and Carniol "did directly and indirectly, (a) employ devices, schemes, and artifices to defraud and (b) engage in acts, practices, and courses of business which operated as a fraud and deceit on Morgan Stanley, Kuhn Loeb, and those corporations and shareholders on whose behalf Morgan Stanley or Kuhn Loeb was acting, and to whom Morgan Stanley or Kuhn Loeb owed fiduciary duties, in connection with the purchase of securities . . . ."

Then Chief Judge Kaufman, writing for this Court in *Chiarella, supra,* stated that violation of an agent's duty to respect client confidences was a clear transgression of Rule 10b–5 "where, as here, the converted information both concerned securities and was used to purchase and sell securities." 588 F.2d at 1368 n.14.[2] The Supreme Court majority found it unnecessary to decide whether this theory had merit, because it was not presented to the jury. 445 U.S. at 236–37, 100 S.Ct. at 1119–20. Justice Stevens stated in his concurring opinion that a legitimate argument could be made that Chiarella's conduct constituted a fraud or deceit upon his employer's clients but that it could also be argued that there was no actionable violation of Rule 10b–5 because the clients were neither purchasers nor sellers of target company securities. *Id.* at 238, 100 S.Ct. at 1120. He added that the Court "wisely leaves the resolution of this issue for another day." For this Court, that day has now come.

We hold that appellee's conduct as alleged in the indictment could be found to constitute a criminal violation of section 10(b) and Rule 10b–5[3] despite the fact that neither Morgan Stanley, Kuhn Loeb nor their clients was at the time a purchaser or seller of the target company securities in any transaction with any of the defendants.

Because enforcement of section 10(b) and Rule 10b–5 has been largely by means of civil litigation, *United States v. Chiarella, supra,* 588 F.2d at 1378 (Meskill, *J.* dissenting) (citing 3 *Bromberg Securities Law* § 10.3 at 241), it is easy to forget that section 10(b) was written as both a regulatory and criminal piece of legislation. *A. T. Brod & Co. v. Perlow,* 375 F.2d 393, 396 (2d Cir. 1967). Looking at the language of the statute, the "starting point in every case involving construction," *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, *J.* concurring), we find no express provision for a private civil remedy. *Id.* at 729, 95 S.Ct. at 1922; *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 24, 97 S.Ct. 926, 940, 51 L.Ed.2d 124 (1977). Section 21 of the Securities and Exchange Act of 1934, 15 U.S.C. § 78u, gives the SEC broad investigatory powers and access to the district court for injunctive and mandamus help in preventing illegal practices. Section 32, 15 U.S.C. § 78ff, provides criminal penalties for willful violation of the Act or rules thereunder, violation of which is made unlawful or the observance of which is required under the Act. There is nothing in the history of the Act to indicate that Congress intended any remedies other than these. *Blue Chip Stamps v. Manor Drug Stores, supra,* 421 U.S. at 729, 95 S.Ct. at 1922.

▮ Rule 10b–5 makes it unlawful for any person to engage in any act or practice

---

2. Although Judge Meskill dissented in *United States v. Chiarella,* his dissent seems to be based primarily upon the absence of a special relationship between Chiarella and the sellers of the stock, the point which the Supreme Court held to be determinative. *See* 588 F.2d at 1378.

3. The acts covered by the indictment occurred prior to promulgation of Rule 14e–3, dealing specifically with insider trading in connection with tender offers. 17 C.F.R. § 240.14e–3.

which operates as a fraud or deceit upon any person "in connection with the purchase or sale of any security." When litigation under this Rule is instituted by the SEC under section 21 or by a United States Attorney under section 32, the court's concern must be with the scope of the Rule, not plaintiff's standing to sue. *See SEC v. National Securities, Inc.*, 393 U.S. 453, 467 n.9, 89 S.Ct. 564, 572, n.9, 21 L.Ed.2d 668 (1969); *United States v. Naftalin*, 441 U.S. 768, 774 n.6, 99 S.Ct. 2077, 2082 n.6, 60 L.Ed.2d 624 (1979). It is only because the judiciary has created a private cause of action for damages the "contours" of which are not described in the statute, that standing in such cases has become a pivotal issue. *Blue Chip Stamps v. Manor Drug Stores, supra*, 421 U.S. at 737, 749, 95 S.Ct. at 1926, 1931. The courts, not the Congress, have limited Rule 10b–5 suits for damages to the purchasers and sellers of securities. The district court's statement that fraud perpetrated upon purchasers or sellers of securities is a "requisite element under the securities laws" is, therefore, an overbroad and incorrect summary of the law.

Long before appellee undertook to participate in the fraudulent scheme alleged in the indictment, this Court, and other Courts of Appeals as well, had held that a plaintiff need not be a defrauded purchaser or seller in order to sue for injunctive relief under Rule 10b–5. *See Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787, 798 (2d Cir. 1969); *Mutual Shares Corp. v. Genesco Inc.*, 384 F.2d 540, 546–47 (2d Cir. 1967); *Kahan v. Rosenstiel*, 424 F.2d 161, 173 (3d Cir.), *cert. denied*, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970); *Britt v. Cyril Bath Co.*, 417 F.2d 433, 436 (6th Cir. 1969). These holdings were consistent with the language of Rule 10b–5, which contains no specific requirement that fraud be perpetrated upon the seller or buyer of securities. Appellee reasonably should have anticipated that in a criminal action the courts likewise would follow the language of the Rule.

In determining whether the indictment in the instant case charges a violation of Rule 10b–5, we need spend little time on the issue of fraud and deceit. The wrongdoing charged against appellee and his cohorts was not simply internal corporate mismanagement. *See Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 168, 30 L.Ed.2d 128 (1971). In *United States v. Chiarella, supra*, 445 U.S. at 245, 100 S.Ct. at 1123, Chief Justice Burger, in dissenting, said that the defendant "misappropriated—stole to put it bluntly—valuable nonpublic information entrusted to him in the utmost confidence." See, also, the dissenting opinion of Justice Blackmun in which Justice Marshall concurred. *Id.* at 245–46, 100 S.Ct. at 1123–24. That characterization aptly describes the conduct of the connivers in the instant case.

Had appellant used similar deceptive practices to mulct Morgan Stanley and Kuhn Loeb of cash or securities, it could hardly be argued that those companies had not been defrauded. *See Superintendent of Insurance v. Bankers Life & Casualty Co., supra*, 404 U.S. at 10–11, 92 S.Ct. at 166–167; *United States v. Brown*, 555 F.2d 336, 338–40 (2d Cir. 1977); *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017 (6th Cir. 1979); *Cooper v. North Jersey Trust Co.*, 226 F.Supp. 972, 977–79 (S.D.N.Y.1964). By sullying the reputations of Courtois' and Antoniu's employers as safe repositories of client confidences, appellee and his cohorts defrauded those employers as surely as if they took their money. *See SEC v. Texas Gulf Sulphur Co.*, 446 F.2d 1301, 1308 (2d Cir. 1971) (citing *Diamond v. Oreamuno*, 24 N.Y.2d 494, 499, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969)).

Appellee and his cohorts also wronged Morgan Stanley's and Kuhn Loeb's clients, whose takeover plans were keyed to target company stock prices fixed by market forces, not artificially inflated through purchases by purloiners of confidential information.

In a tender-offer situation, the effect of increased activity in purchases of the target company's shares is, similarly, to drive up the price of the target company's shares; but this effect is damaging to the offering company because the

tender offer will appear commensurately less attractive and the activity may cause it to abort.

13A B. Fox & E. Fox, *Business Organizations, Corporate Acquisitions and Mergers,* § 27.05[4] (1981).

In other areas of the law, deceitful misappropriation of confidential information by a fiduciary, whether described as theft, conversion, or breach of trust, has consistently been held to be unlawful. *See, e. g., United States v. Girard,* 601 F.2d 69 (2d Cir.), *cert. denied,* 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979); *United States v. Kent,* 608 F.2d 542, 544–45 (5th Cir. 1979), *cert. denied,* 446 U.S. 936, 100 S.Ct. 2153, 64 L.Ed.2d 788 (1980); *Abbott v. United States,* 239 F.2d 310, 313–14 (5th Cir. 1956); *United States v. Buckner,* 108 F.2d 921, 926–27 (2d Cir.), *cert. denied,* 309 U.S. 669, 60 S.Ct. 613, 84 L.Ed. 1016 (1940). Appellee would have had to be most ingenuous to believe that Congress intended to establish a less rigorous code of conduct under the Securities Acts. *See United States v. Naftalin, supra,* 441 U.S. at 774–77, 99 S.Ct. at 2082–83; *Superintendent of Insurance v. Bankers Life & Casualty Co., supra,* 404 U.S. at 11–12, 92 S.Ct. at 167–168; *A. T. Brod & Co. v. Perlow, supra,* 375 F.2d at 396–97.

Appellee is left, then, with the argument that his fraud had no connection with the purchase or sale of securities. However, since appellee's sole purpose in participating in the misappropriation of confidential takeover information was to purchase shares of the target companies, we find little merit in his disavowal of a connection between the fraud and the purchase. *See Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 380–81 (2d Cir. 1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975).

In 1972, the year preceding the one in which appellee's fraudulent scheme was hatched, the Supreme Court decided *Superintendent of Insurance v. Bankers Life & Casualty Co., supra,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128. Citing with approval both *Cooper v. North Jersey Trust Co., supra,*

226 F.Supp. 972 and *A. T. Brod & Co. v. Perlow, supra,* 375 F.2d 393, the Court construed the phrase "in connection with" flexibly to include deceptive practices "touching" the sale of securities, *id.* 404 U.S. at 12, 92 S.Ct. at 168, a relationship which has been described as "very tenuous indeed". 1 A. Bromberg & L. Lowenfels, *Securities Fraud and Commodity Fraud,* § 4.7(574)(3) at 88.34 (1979). This Court and others have followed the teachings of the *Bankers Life* case.

In *Competitive Associates, Inc. v. Laventhol, Krekstein, Horwath & Horwath,* 516 F.2d 811, 815 (2d Cir. 1975), which involved the allegedly fraudulent certification of financial statements, we said:

> The broad 'touch' test enunciated in *Bankers Life* is certainly met by plaintiff's allegations that the very purpose of defendants' certification of Takara's financial statement was to aid in placing Yamada in a position where he could manipulate securities prices and sell these securities to investors attracted by Yamada's reputation and performance.

We reversed summary judgment in defendants' favor because, we said, that "[p]laintiff has alleged a fraudulent scheme the accomplishment of which is directly related to the trading process." *Id. See also Mansbach v. Prescott Ball & Turben, supra,* 598 F.2d at 1028; *Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 594–95 (5th Cir.), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974); *Jannes v. Microwave Communications, Inc.,* 461 F.2d 525, 528–30 (7th Cir. 1972).

In *United States v. Naftalin, supra,* 441 U.S. 768, 99 S.Ct. 2077, 60 L.Ed.2d 624, where the defendant was convicted of violating section 17(a)(1) of the Securities Act of 1933, 15 U.S.C. § 77q(a)(1), by defrauding his broker-agent, the Court held that investor protection was not the sole purpose of the Act. *Id.* at 775, 99 S.Ct. at 2082. Justice Brennan, writing for the Court, said that a "key part" of the program evidenced by enactment of the federal securities statutes was the "effort 'to achieve a high standard of business ethics ... *in every*

*facet of the securities industry.'"* *Id.* (quoting *SEC v. Capital Gains Bureau, supra,* 375 U.S. at 186–87, 84 S.Ct. at 279–80 with emphasis added).

▇ The court below, in holding that appellee could not be held criminally liable for violating Rule 10b–5 unless he defrauded a purchaser or seller, misconstrued the thrust of the Securities Acts. Moreover, putting aside the question of standing, as we must in this criminal case, we believe that Rule 10b–5's proscription of fraudulent and deceptive practices upon any person in connection with the purchase or sale of a security provided clear notice to appellee that his fraudulent conduct was unlawful. *United States v. Persky,* 520 F.2d 283, 288 (2d Cir. 1975).

## THE MAIL FRAUD

▇ The indictment charges appellee and his cohorts with devising a scheme and artifice to defraud and with misappropriating confidential information concerning mergers and acquisitions and covertly using that information to buy stock in target companies. It clearly charges appellee with fraudulent misappropriation of property that did not belong to him. Intangibles such as "confidential and nonpublic commercial information" fall within the definition of "property" under the mail fraud statute. *United States v. Louderman,* 576 F.2d 1383, 1387 (9th Cir.), *cert. denied,* 439 U.S. 896, 99 S.Ct. 257, 58 L.Ed.2d 243 (1978). *See United States v. Von Barta, supra,* 635 F.2d at 1006; *United States v. Brown, supra,* 540 F.2d at 374; *United States v. Kelly,* 507 F.Supp. 495, 499–504 (E.D.Pa.1981).[4]

We believe the district court misconstrued the law of this Circuit concerning fraudulent breaches of fiduciary obligations under the statute. *United States v. Von Barta, supra,* upon which the district court relied, did not involve fraudulent misappropriation of confidential information entrusted to an employer. *Von Barta* concerned an employee's failure to disclose material information to his employer, allegedly

in breach of a fiduciary duty of honesty and loyalty. The fraudulent scheme in the instant case, like those in *United States v. Kent, supra,* 608 F.2d 542, and *Abbott v. United States, supra,* 239 F.2d 310, was more egregious. Its "object was to filch from [the employer] its valuable property by dishonest, devious, reprehensible means." *Abbott v. United States, supra,* at 314.

▇ However, in addition to alleging fraudulent misappropriation of an employer's secret information, this indictment also alleges that the scheme included breach of the employees' fiduciary duties by material misrepresentations to the employer and non-disclosure of material information required to be disclosed. In *Von Barta* the Government had asserted the broad claim that every employee breach of a fiduciary duty of honesty and loyalty violates the mail fraud statute. Although we rejected that sweeping claim, 635 F.2d at 1002, we concluded that an employee's breach of his fiduciary obligations is actionable under the statute when it encompasses the violation of a "duty to disclose material information to his employer." *Id.* at 1006. If *Von Barta* left any doubt in the matter, and we do not believe that it did, *United States v. Bronston,* 658 F.2d 920 (2d Cir., 1981), decided after the district court's ruling in this case, clearly spelled out that "the concealment by a fiduciary of material information which he is under a duty to disclose to another under circumstances where the non-disclosure could or does result in harm to another is a violation of the [mail fraud] statute." At 926. We do not intend, of course, that this rule be used in bootstrap fashion by finding an obligation to disclose in every breach of fiduciary duty. However, the indictment charges that Courtois and Antoniu were specifically required to report the buying activity which they concealed and that they falsely and fraudulently asserted that they maintained no direct or indirect interests in securities trading accounts. This was a sufficient averment

---

4. Confidential business secrets are specifically protected in a number of criminal statutes. *See, e. g.,* 18 U.S.C. § 1702; N.Y. Penal Law, §§ 155.00 & 155.30(3) (McKinney).

of wrongdoing under *United States v. Bronston, supra,* and *United States v. Von Barta, supra.*[5]

■■■■ The district court erred in holding that, in every mail fraud case based upon a breach of fiduciary duty by a private employee, there must be proof of "direct, tangible, economic loss to the victim, actual or contemplated." *See, United States v. Von Barta, supra,* 635 F.2d at 1006; *United States v. Dorfman,* 335 F.Supp. 675, 679 (S.D.N.Y.1971), *aff'd,* 470 F.2d 246 (2d Cir. 1972), *cert. dismissed,* 411 U.S. 923, 93 S.Ct. 1561, 36 L.Ed.2d 317 (1973). Assuming, however, that such proof would be required in the instant case, the indictment fairly informed appellee that this was part of the charge against which he must defend. *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974). Appellee could not have been unaware that confidential information, such as that involved here, has a "negative" value which is diminished when confidentiality is lost. *Abbott v. United States, supra,* 239 F.2d at 314. As discussed above, Morgan Stanley and Kuhn Loeb, and their clients as well, would almost surely be prejudiced if the veil of secrecy surrounding contemplated tender offers was fraudulently and surreptitiously lifted. At least, the jury could so find.

## THE CONSPIRACY

Because dismissal of the substantive counts led to the dismissal of the conspiracy count, reinstatement of the former requires the reinstatement of the latter.

## DISPOSITION

The order dismissing the indictment is reversed, and the matter is remanded to the district court for further proceedings consistent with this opinion.

DUMBAULD, Senior District Judge, concurring and dissenting:

I am not certain that the deceptive practice engaged in by defendant and his confederates was a fraud "in connection with the purchase or sale of any security" and hence violative of Section 10(b) of the Securities Exchange Act of 1934 (48 Stat. 891, 15 U.S.C. § 78j). *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980) and *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) seem to evince a trend to confine the scope of § 10(b) to practices harmful to participants in actual purchase-sale transactions.

The culprits in the case at bar (as in *Chiarella*) owed no duty to the sellers of the target company securities which they purchased. Though they deceptively and improperly violated a fiduciary duty to their employers and customers of their employers, those parties had not at that time actually purchased or sold any target company securities. All that can be said is, as Mr. Justice Stevens judiciously observes, that respectable arguments could be made in support of either position (445 U.S. at 238, 100 S.Ct. at 1120).

Hence I prefer to rest my concurrence in the reversal of the District Court's exculpation of defendant from trial for his reprehensible activities upon the more solid

---

**5.** The district court feared that the indictment here was an attempt to revive the broad theory of employee fiduciary liability rejected in *Von Barta.* The court cited the following portion of ¶ 10(d) of the indictment:

In so doing, and by sharing profits from the sale of those securities with Courtois and Antoniu, Newman, Carniol and Spyropoulos aided, participated in and facilitated Courtois and Antoniu in violating the fiduciary duties of honesty, loyalty and silence owed directly to Morgan Stanley, Kuhn Loeb, and clients of those investment bankers.

However, this allegation does not rest on a theory that every employee fiduciary breach is actionable. On the contrary, the allegation is far narrower. The introductory words, "In so doing," refer to the immediately preceding allegations, which charge that Newman, along with Carniol and Spyropoulos:

received covert information and advice from Antoniu and (through Antoniu) from Courtois. Based on that information and advice, Newman, Carniol and Spyropoulos opened and maintained secret foreign accounts and purchased target companies' securities through those secret foreign accounts.

ground that he has clearly violated the Mail Fraud statute, 18 U.S.C. § 1341. As required by that provision, defendant is a person who "having devised ... a scheme ... to defraud," for the purpose of "executing such scheme" makes use of the mails.

In view of the sophisticated mechanisms employed for concealment of defendant's activities by use of foreign bank accounts, distribution of purchase orders, and utilization of confederates abroad, it is plain that the fraudulent scheme contemplated use of the mails as an integral feature of its operation and an essential incident to its successful consummation. *Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–363, 98 L.Ed. 435 (1954). That defendant's scheme was one to defraud is explicitly demonstrated by *United States v. Von Barta*, 635 F.2d 999, 1006–1007 (2d Cir. 1980).

Accordingly, I concur in reversal of the order of the district court.