**UNITED STATES of America**

v.

**John GALLANT, Defendant.**

**No. 83 Cr. 053 (DNE).**

United States District Court,
S.D. New York.

Aug. 8, 1983.

---

**2.** Plaintiff also argues that the decision contravened the project agreement in that it deprived plaintiff of its contractual right to pursue "any and all remedies available under law". This

argument is without merit. Plaintiff pursued its remedies under law and was denied damages in accordance with legal principles governing contract law.

Charles Clayman, New York City, of counsel), for defendant.

## MEMORANDUM OPINION AND ORDER

EDELSTEIN, District Judge:

### FACTUAL BACKGROUND

The defendant, John Gallant ("Gallant") is charged in a forty-nine count indictment with fourteen counts of mail fraud, 18 U.S.C. § 1341 (Counts 1 through 14); four counts of wire fraud, 18 U.S.C. § 1343 (Counts 15 through 18); nine counts of interstate transportation of stolen property, 18 U.S.C. § 2314 (Counts 19 through 27); and, twenty-two counts of copyright infringement, 17 U.S.C. § 506(a) (Counts 28 through 49). There is no dispute as to the facts giving rise to the indictment.

From October 1, 1979 to May, 1981 Gallant worked as a salesman at Gallant International, his father's apparel business. In May, 1981, agents of the Federal Bureau of Investigation searched Gallant International[1] and discovered that, in addition to selling women's clothing, Gallant was selling "bootleg" record albums from his father's warehouse. A bootleg album is an unauthorized recording of a live performance that is recorded either at the performance or from a radio or television broadcast of the performance and is not available for purchase as an authorized recording. Bootleg albums usually carry blank labels that make no suggestion that the album is authorized by the performer or the performer's record company, and the sound quality is generally inferior to that of studio recordings.[2]

John S. Martin, Jr., U.S. Atty., S.D.N.Y., New York City (Martin L. Perschetz, Asst. U.S. Atty., New York City, of counsel), for plaintiff.

Gallop, Dawson, Kimelman & Clayman, New York City (Steven Kimelman and

---

1. The search has not been challenged.

2. Gallant contends that "bootlegging" is distinguished from two other types of record album infringement, "piracy" and "counterfeiting." Pirated record albums are those involving the unauthorized duplication of sounds from an authorized recording that is sold on the market. Counterfeited record albums are those involving the unauthorized duplication of the entire album, including not only the sounds but the label, packaging and art work as well. Gallant contends that bootleg albums do not work a

fraud on the public because purchasers of bootleg albums know what they are buying.

The government contends that for the purpose of this motion, the distinction between bootleg and counterfeit or pirated record albums is immaterial. In its view bootlegged records defraud *copyright proprietors* to the same extent as counterfeited or pirated records. Government's Memorandum of Law in Opposition to Defendant's Motion to Dismiss Counts One Through Twenty-Seven of the Indictment p. 5.

The search uncovered thousands of bootleg albums of popular contemporary recording artists performing copyrighted musical compositions.[3] The search also uncovered business records, such as invoices, journals and United Parcel Service receipts, reflecting shipments of bootleg albums to record distributors and retailers throughout the United States. Gallant sold these bootleg albums primarily as a wholesaler.

Gallant has moved pursuant to Fed.R. Crim.P. 12(b)(2) to dismiss counts 1 through 27 of the indictment on the ground that the indictment fails to establish a cognizable scheme to defraud or to transport stolen property interstate. He does not dispute the sufficiency of the allegations of counts 28 through 49, the copyright infringement counts. 17 U.S.C. § 506(a).

## DISCUSSION

### A. Gallant's Challenge to the Mail and Wire Fraud Counts.

Gallant has moved to dismiss counts 1 through 14 and 15 through 18 of the indictment charging him with mail fraud, 18 U.S.C. § 1341 and wire fraud, 18 U.S.C. § 1343, respectively. Counts 1 through 18 charge Gallant with unlawfully, wilfully and knowingly

> defraud[ing] recording artists, musical composers, music publishing companies, and recording companies, thereby depriving them of their rightful royalties, payments and income, and infringing on their lawful property and contractual rights, by distributing, selling and offering for sale phonograph records containing performances of musical compositions which were reproduced illegally and with-

out authorization of their copyright proprietors.

Indictment ¶ 2. The indictment further alleges that Gallant engaged in a scheme and artifice, involving the use of the mails and wires, to sell hundreds of thousands of dollars of unauthorized phonorecords containing illegally reproduced copyrighted compositions. *Id.* ¶ 3. The government contends that by virtue of this scheme Gallant obtained money and property by means of fraud. Specifically, the government contends that Gallant defrauded the copyright holders who possess the exclusive rights to distribute and reproduce recordings containing their copyrighted works.

Gallant contends the indictment fails to state a cognizable scheme to defraud because he made no false statements, misrepresentations or promises to the copyright holders. Simply stated, Gallant's position is that while he may have infringed the copyright holders' copyrights, he defrauded no one. Affidavit of Steven Kimelman, sworn to March 23, 1983 ¶ 9.

18 U.S.C. §§ 1341 and 1343 prohibits the use of the mails or of wire, radio or television communication for "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises...." The two elements of the offense are: (1) use of the mails or wires; (2) to further a scheme to defraud. Gallant has not denied that he used the wires and mails in connection with his distribution of the bootleg records. The issue raised by the defendant's motion therefore is whether the distribution and sale of bootleg records is a scheme to defraud.

---

**3.** The indictment alleges: "Said phonorecords sold and offered for sale by the defendant GALLANT had an aggregate value of hundreds of thousands of dollars, and included musical compositions performed by recording artists such as The Beatles, The Rolling Stones, The Who, Fleetwood Mac, David Bowie and Bruce Springsteen; composed by musical composers such as John Lennon, Paul McCartney, Mick Jagger, Keith Richards, Peter Townshend, Stevie Nicks, David Bowie and Bruce Springsteen; published by publishing companies holding copyright proprietorships in said musical compositions, such as Northern Songs, Ltd., Gideon Music, Inc., Fabulous Music, Ltd., Rockhopper Music, Ltd., Titanic Music, Ltd., and Laurel Canyon Music, Inc.; and recorded by recording companies with exclusive rights to record performances of the aforesaid artists, such as Capitol Records, Inc., Rolling Stones Records, Inc., MCA Records, Inc., Warner Brothers Records, Inc., RCA Records, Inc., and CBS Records, Inc." Indictment ¶ 3.

■ The elements of fraud are well established: (1) the defendant must have made an affirmative misrepresentation or nondisclosure; (2) that deception must be material; and (3) it must be done in contemplation of harm to the defrauded party or gain to the defendant. *United States v. Bronston,* 658 F.2d 920, 927 (2d Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982).[4] The government does not contend that Gallant made any affirmative misrepresentation in furtherance of the alleged scheme to defraud. Instead, the government asserts that, under the copyright law, one who intends to distribute recordings of copyrighted musical compositions is under a duty to disclose his plans to the copyright owner. Because Gallant failed in this duty, the government argues, he committed a fraud.

The government initially asserted that the compulsory license provision, 17 U.S.C. § 115 (which allows a party seeking to make and distribute a copyrighted work to do so by serving a notice on, and paying a royalty to, the copyright holder) imposes upon record bootleggers a "duty" to disclose their activities to the copyright holder. The government further argued that a bootlegger's failure to comply with the notice provision constitutes a breach of a duty to disclose and that this is a "scheme to defraud" under a mail and wire fraud prosecution.

Gallant argued that the compulsory license provision is inapplicable because it refers only to one who seeks to "make and distribute phonorecords of the [copyrighted] work." It is undisputed that Gallant operated solely as a middleman who distributed, but did not "make," bootleg records. The government subsequently conceded that § 115 was not applicable. *See* Letter of Assistant United States Attorney Martin L. Perschetz, dated May 6, 1983 (the "Perschetz Letter"), p. 1–2.

The government argues that even if § 115 does not impose a duty to disclose

upon bootleg record distributors, that fact only serves to underscore Gallant's violation. The government reasons that the compulsory license provision of § 115 is a limitation upon a copyright holder's exclusive right to reproduce and distribute musical compositions under 17 U.S.C. §§ 106(1) and 106(3). That is, § 115 allows someone to reproduce and distribute a copyrighted work *without the copyright owner's permission,* if the requirements of § 115 are met. Hence, the government argues, if § 115 was unavailable to Gallant, then he had a stronger and an unconditional duty to obtain the copyright holders' permission to distribute their musical compositions. To obtain their permission, logically, he would have to disclose to them his proposed activity. This duty to disclose, the government argues, is at least as forceful as any duty under § 115, and a violation of it can be a scheme to defraud. *See* the Perschetz Letter, p. 2–3.

■ Section 106 of the Act makes clear that one who obtains a valid copyright in a musical composition has an exclusive right to reproduce and distribute the copyrighted material. *United States v. Powell,* 701 F.2d 70 (8th Cir.1983); *Capitol Records, Inc. v. Mercury Records Corp.,* 221 F.2d 657 (2d Cir.1955). Gallant was under a duty to obtain a consensual license from the copyright holders to distribute records of their copyrighted compositions.

The government contends Gallant's failure to obtain a license from the copyright holders is a breach of a duty Gallant owed to the copyright holders and the basis for a fraud prosecution. *See* Transcript of May 9, 1983 hearing, 11. In support of its position, the government cites a line of authority in this Circuit holding that a fraud prosecution may be predicated upon the defendant's failure to disclose information the defendant was under a duty to disclose. *See United States v. Newman,* 664 F.2d 12, 19 (2d Cir.1981); *Bronston, supra,* 658 F.2d at 926; *United States v. Von Barta,* 635 F.2d

---

**4.** Gallant does not contend that the allegations of the indictment were insufficient with respect to the elements numbered (2) and (3) *supra.*

999, 1006 (2d Cir.1980), *cert. denied,* 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981).

▆▆▆ While the court concurs with the government's reading of the case law that in certain circumstances a breach of a duty to disclose may provide the basis for a mail or wire fraud prosecution, most of the cases cited by the government are inapposite in that they involve a breach of a fiduciary, not a statutory, duty.[5] A statutory disclosure duty, as opposed to a fiduciary duty, does not protect a relationship that is based upon trust. The government does not contend that a fiduciary duty existed in the present case. The court finds the authority relied upon by the government to be unpersuasive on this issue.

The government also claims that a breach of a statutory duty to disclose information is cognizable under the fraud statutes. In support of this contention, it cites *United States v. Buckley,* 689 F.2d 893, 898 (9th Cir.1982), *United States v. Melvin,* 544 F.2d 767, 774 (5th Cir.), *cert. denied,* 430 U.S. 910, 97 S.Ct. 1184, 51 L.Ed.2d 587 (1977) and *United States v. Brewer,* 528 F.2d 492, 496 (4th Cir.1975).

In *Buckley,* the fraud prosecution was based on the defendants' failure to comply with a state law requiring lobbyists to file reports disclosing all lobbying expenditures. The Ninth Circuit reversed the district court's dismissal of the mail fraud indictment on the ground that the defendants' failure to apprise the citizens of the state of Washington as to whom the defendants made political payments constituted a "scheme to defraud." 689 F.2d at 898. The breach of duty in the *Buckley* case is much more analogous to a breach of a fiduciary, rather than a statutory, duty because the

object of the legislation was to expose those who were "hiding contributions that were intended to influence officials improperly." 689 F.2d at 897. *Cf. United States v. Dixon,* 536 F.2d 1388, 1400–01 (2d Cir.1976) (public official's breach of duty constitutes fraud). Indeed the language of the *Buckley* decision suggests that the court viewed the enforcement of trust between public officials and the citizenry as more important than the enforcement of a statute.[6] Thus, the court is not persuaded that the *Buckley* decision materially furthers the government's position that an infringement of the Copyright Act is "fraud" within the meaning of the mail fraud statute.

*Melvin* and *Brewer* were mail fraud prosecutions arising out of violations of the Jenkins Act, 15 U.S.C. § 376, which requires cigarette sellers to register with the tax officials of states where the sellers advertise or ship cigarettes. In *Melvin* the defendants made affirmative misrepresentations in their tax filings, thus making their scheme to defraud clearly cognizable. 544 F.2d at 774. The *Brewer* decision does support the government's interpretation of the fraud statutes. *Brewer* held that tax evasion, even absent an affirmative misrepresentation, is "fraud" within the meaning of the mail fraud statute. The Second Circuit has not ruled on this issue, and it is not clear how it would rule in a *Brewer* tax evasion situation. Absent guidance from the Second Circuit, however, this court is reluctant for the following reasons to expand the ambit of mail fraud by applying the *Brewer* tax evasion rule to the copyright infringement circumstances of this case.

The *Brewer* court did not indicate the rationale for its holding that a violation of

---

**5.** The court notes that the court of appeals has cautioned that even where a breach of a fiduciary duty has occurred, that does not necessarily provide the basis for a fraud prosecution. *See e.g. United States v. Newman, supra,* 664 F.2d at 19. *See also United States v. Bronston, supra,* 658 F.2d at 926; *United States v. Von Barta, supra* 635 F.2d at 1002, 1006–07.

**6.** In addition, the *Buckley* court declined to follow *United States v. Dixon, supra,* where the

Second Circuit, in dismissing a mail fraud conviction, refused to extend the mail fraud statute to a failure to disclose statements in a proxy solicitation in violation of the securities laws, "where this was not in furtherance of some larger scheme contemplating pecuniary loss to someone or direct pecuniary gain to those who designed it." *United States v. Dixon, supra,* 536 F.2d at 1399.

the Jenkins Act is a basis for fraud. The court merely stated: "Her willful decision not to comply with the Jenkins Act furnishes additional evidence of her intent to ship cigarettes ... knowing that Florida could not readily detect the sales and collect the taxes that were owed by her customers." 528 F.2d at 496. Although, the *Brewer* opinion did not discuss the exact nature of the violation of duty that supported the fraud prosecution, the two statutes involved in that case, the Jenkins Act and the Florida tax statute, explicitly imposed a disclosure requirement separate from the underlying duty to pay taxes. *Brewer, supra* 528 F.2d at 495. Here the disclosure duty, which the government urges as a basis for a fraud, is not explicit and is not separate from the duty not to infringe copyrights.

As the Second Circuit has recognized, courts have adopted different views as to the scope of the mail fraud statute. *Barta, supra,* 635 F.2d at 1005. Although some courts hold that illegal conduct alone may constitute the basis of the "fraud" element of a mail fraud prosecution, *see e.g. Brewer, supra,* the Second Circuit has refused to adopt that sweeping approach. *See generally Bronston, supra,* 658 F.2d at 929; *Newman, supra,* 664 F.2d at 19 ("We do not intend, of course, that this rule be used in a bootstrap fashion by finding an obligation to disclose in every breach of fiduciary duty.").

■ In order to successfully maintain a mail fraud prosecution under the Second Circuit rule, in the absence of proof of affirmative misrepresentation, the government must prove that the defendant breached a duty to disclose separate from the commission of an otherwise criminal act. "The additional element which frequently transforms a [wrongful act] into a criminal offense [of the mail fraud statute] is a violation of the ... duty to disclose material information." *Barta, supra* 635

F.2d 1006. *See also Newman, supra,* 664 F.2d at 19.

In the instant case the government has not alleged that Gallant violated any explicit duty nor any duty independent of his alleged violations of the copyright laws. The government attempts to bootstrap a violation of the copyright laws into a violation of the mail fraud statute. The adoption of such an extension of the *Brewer* rule urged by the government could turn any crime into a mail fraud violation.[7] If Congress had intended that any crime, like a copyright violation, could supply the "fraud" element of a mail fraud violation, then it would not have drafted the mail fraud statute, 18 U.S.C. §§ 1341 and 1343, to forbid the use of mails and wires in furtherance of "any scheme or artifice to defraud." Instead, it would have forbidden the use of mails and wires in the furtherance of "any crime." Congress did not do so, and the Second Circuit has not so expanded the ambit of the law.

In addition, the policies underlying the mail fraud statute suggest that this reading of the statute is correct. In the words of Chief Justice Burger, the statute

> has traditionally been used against fraudulent activity as a first line of defense. When a "new" fraud develops—as constantly happens—the mail fraud statute becomes a stop-gap device to deal on a temporary basis with the new phenomenon, until particularized legislation can be developed and passed to deal directly with the evil.

*United States v. Maze,* 414 U.S. 395, 405–06, 94 S.Ct. 645, 651, 38 L.Ed.2d 603 (1974) (Burger, C.J., dissenting). In the present case, the fraud statutes are not needed as "stop gaps" because there is particularized legislation—the Copyright Act—which has already been developed to deal with the instant offense. *See also United States v. Dixon, supra,* 536 F.2d at 1398–1401 (court expressed misgivings over government's use

---

7. The government could argue, for example, that one cannot use another's property without the owner's permission, i.e. one cannot steal it. To take it, one must get permission. To get permission, one must disclose to the owner the proposed appropriation. Under the government's reasoning, a failure to so disclose is arguably a breach of a duty to disclose and could thus convert any theft involving a phone call into a wire fraud violation.

of mail fraud statute where gravamen of indictment was another statute); *United States v. Mangan,* 575 F.2d 32, 49 (2d Cir.), *cert. denied,* 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 324 (1978) (same). Similarly, in *United States v. Henderson,* Judge Weinfeld observed: "It is beyond peradventure that the thrust of the [mail fraud] statute was to protect the public, more precisely, the gullible public, against the various fraudulent schemes that the cunning of the trickster could devise." 386 F.Supp. 1048, 1052–53 (1974) (footnote omitted). The present case does not involve the deception of the "gullible public," insofar as the consumers of Gallant's bootleg records were aware they were buying unauthorized recordings. Thus, there is no reason to expand the reach of the fraud statutes when more specific legislation proscribes Gallant's unauthorized record distribution.

■ Finally, recent legislation confirms the court's reluctance to expand the scope of the fraud statutes in this case. In 1982 Congress enacted the Piracy and Counterfeiting Amendments Act of 1982, 18 U.S.C. §§ 2318 and 2319. By these amendments, Congress elevated record counterfeiting and piracy to a felony. There is, however, no reference in the language of the amendments or in the legislative history to bootlegging. Indeed, the legislation appears to be directed specifically at the unlawful duplication of copyrighted works that have already been embodied in *existing* products on the market. There is no indication of any intent for the amendments to reach the unauthorized duplication of live performances that are not already embodied in an existing marketed product.[8] The Senate Report states that the purpose of the 1982 amendments is to

increase the penalties for trafficking in counterfeit *labels* for copyrighted records, tapes, and audiovisual works and for copyright infringements involving such products.

S.Rep. No. 97–274, 97th Cong., 2d Sess., 1 (1982), U.S.Code Cong. & Admin.News 1982, p. 127 (emphasis added). Application of the fraud statutes here would broaden the scope of the statute to encompass record bootlegging without any evidence that Congress intended such an expansion, that the Second Circuit has approved it, or that federal policies support it. For the foregoing reasons, the court finds that the wire and mail fraud statutes are not applicable to the facts of the present case. Accordingly, Gallant's motion to dismiss counts 1 through 18 of the indictment is granted.

*B. Gallant's Challenge to the Interstate Transportation of Stolen Property Counts.*

Counts 19 through 27 of the indictment charge Gallant with violation of the National Stolen Property Act ("NSPA"), 18 U.S.C. § 2314, which provides that "whosoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud ... [s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both." Gallant contends that his interstate distribution of bootleg recordings does not violate § 2314 because he has not "stolen [or] converted" any "goods" within the meaning of § 2314. Specifically, Gallant argues that a live performance is incapable of being stolen because it is not within the protection of the copyright laws. Defendants Reply Memorandum in Support of Defendant's Motion to Dismiss, 9.

The government asserts that the property Gallant is alleged to have stolen in violation of § 2314 "consisted of the copyrighted musical composition of the songs contained in his bootleg recordings," not the live performances themselves. *See* Government's Memorandum of Law in Opposition to the Defendant's Motion to Dismiss Counts One Through Twenty-Seven of the Indictment,

---

**8.** This is a distinction with a difference. Unauthorized duplications of existing products compete directly with the copyright holder's income from sales of those products. Unauthorized duplications of performances that are not embodied in an existing marketed product do not similarly compete directly with the copyright holder's money making enterprise.

("Government's Memorandum") 23. As discussed *supra* the copyright violation in question is predicated upon the infringement, under 17 U.S.C. § 106, of the exclusive right to the musical compositions involved.[9] The government further asserts that "as long as stolen intangible material is embodied in a tangible medium which is transported in interstate commerce, the requirements of § 2314 are satisfied." Government's Memorandum, 24.

█ The elements of the offense embraced by § 2314 are as follows: 1) transportation in interstate commerce of goods or wares that are valued at $5,000 or more; 2) by a defendant "knowing"; 3) "the same"; 4) to have been "stolen, converted, or taken by fraud." In this case it is alleged that records valued at greater than $5,000 were transported across state lines by Gallant, who knew the status of these goods. Courts have repeatedly rejected the requirement that the goods that are transported be in exactly the same form as that which was "stolen, converted, or taken by fraud."[10] The issue presented is whether the intangible musical compositions were "stolen [or] converted" within the meaning of § 2314.[11]

█ Although it is a rule of statutory interpretation that penal statutes are construed narrowly, that rule must be applied in light of its purpose. The purpose of the rule is to ensure that criminal statutes give a clear warning to all potential violators of exactly what behavior is forbidden. *United States v. Bass,* 404 U.S. 336, 348, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971); *Bouie v. City of Columbia,* 378 U.S. 347, 351, 84 S.Ct. 1697, 1701, 12 L.Ed.2d 894 (1964); *Kordell v. United States,* 335 U.S. 345, 349, 69 S.Ct. 106, 109, 93 L.Ed. 52 (1948). In the case at bar Gallant has not argued that the copyright statute does not give clear notice that the alleged infringement was illegal or that the interstate distribution was also illegal. Narrow construction of penal statutes should avoid unfairness by protecting people who cannot gain notice from the law that their behavior is criminal. A person who has notice that his infringing and distribution activities are illegal has notice that he treads on dangerous ground. The Supreme Court has stated that it is not "unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." *Boyce Motor Lines v. U.S.,* 342 U.S. 337, 340, 72 S.Ct. 329, 331, 96 L.Ed. 367 (1952). Hence this court concludes that a myopic reading of § 2314, rather than reading it in conjunction with the copyright law, is not appropriate. Thus, this court gives § 2314 a fair and sensible reading. *See United States v. Rothberg,* 480 F.2d 534, 535 (2d Cir.1973).[12]

9. The question of whether the recording of a live performance is itself a violation of the copyright law presents a different issue from that which the court addresses here.

10. Nearly every court considering an indictment under § 2314 has not read the words "the same" to require literally that what is transported be in exactly the same form as what was stolen. *United States v. Bottone,* 365 F.2d 389 (2nd Cir.) *cert. denied,* 385 U.S. 974, 87 S.Ct. 514, 17 L.Ed.2d 437 (1966); *United States v. Lester,* 282 F.2d 750, 755 (3d Cir.1960), *cert. denied,* 364 U.S. 937, 81 S.Ct. 385, 5 L.Ed.2d 368 (1961); *United States v. Atherton* 561 F.2d 747, 752 (9th Cir.1977). The decision relied upon by the defendants, *United States v. Smith,* 686 F.2d 234 (5th Cir.1982), which interprets § 2314 more narrowly than does any other decision, states that the issue of whether what is transported is "goods" under the statute is inextricably linked to the issue of whether those goods were "stolen" under the statute. Signifi-

cantly, however, nowhere in *Smith* does the court hold that what is stolen must be exactly "the same" as what is transported in order to make out a violation of § 2314.

11. The court decided *supra* that the copyrighted compositions were not taken by "fraud."

12. This court notes that the existence of other statutes under which Gallant could be prosecuted for the same conduct does not bar the government's prosecution under § 2314. *See United States v. Sam Goody, Inc.,* 506 F.Supp. 380, 386–87 (E.D.N.Y.1981) and the cases cited therein. A defendant may be prosecuted under two statutes so long as one has a necessary element that is not a requisite element of the other statute. *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932).

In this case Gallant has been charged under the copyright statute as well as under § 2314.

Courts have held that "intangible" property is capable of being stolen. In *United States v. Bottone*, 365 F.2d 389 (2nd Cir. 1966), *cert. denied*, 385 U.S. 974, 87 S.Ct. 514, 17 L.Ed.2d 437 (1966) defendants stole secret manufacturing processes by removing the original documents from the files of the manufacturer in New York. They photocopied the documents within the state, returned the originals to the files, and transported the copies interstate. Holding that the interstate transport of the photocopies containing trade secrets constituted a violation of § 2314, the Second Circuit reasoned that intangible stolen property could constitute the basis of a § 2314 violation if that property was embodied in tangible "goods, wares, [or] merchandise" transported across state lines.[13]

The following courts have held that intangible copyrights can be "stolen": *United States v. Drebin*, 557 F.2d 1316, 1332 (9th Cir.1977), *cert. denied*, 436 U.S. 904, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978) (interpreting *Bottone* to have implied that copyrights can be stolen); *United States v. Berkwitt*, 619 F.2d 649, 657 (7th Cir.1980) (holding that the value of the musical tapes that were transported included the value of the copyrighted works that had been stolen); *United States v. Whetzel*, 589 F.2d 707, 712 (D.C.Cir.1978); *United States v. Sam Goody*, 506 F.Supp. 380 (E.D.N.Y.1981).

Gallant relies chiefly on *United States v. Smith*, 686 F.2d 234 (5th Cir.1982) for the proposition that intangible goods may not be "stolen" under § 2314. In *Smith* the defendants had been convicted below of copyright infringement and interstate transportation of stolen property for videotaping and distributing copies of movies and other programs publicly broadcast on television. The Fifth Circuit reversed the conviction on the ground that copyrighted compositions could not be "stolen" or "converted" within the meaning of § 2314.

The *Smith* decision examines several sources for the definition of "stolen," but then elaborates upon only those portions of the quoted definitions that define "stolen" narrowly. For example, the *Smith* decision cites the definition of "steal" from Black's Law Dictionary. That definition concludes: " 'in popular usage "stealing" may include the unlawful appropriation of things which are not technically the subject of larceny, e.g. immovables.' " *Smith, supra*, 686 F.2d at 242. Similarly the definition of "conversion" used by the *Smith* court concludes that conversion covers: " 'Unauthorized and wrongful exercise of dominion and control over another's personal property, to exclusion of or inconsistent with rights of owner.' " *Id.* Either of these definitions

---

Section 2314 requires proof that the illegally obtained material is transported interstate and that what is transported is worth at least $5,000. This is not an element of a simple copyright violation.

Furthermore, the additional element of interstate transportation is substantive. A copyright infringer who violates the criminal copyright laws in one state commits one violation. Someone who infringes a copyright and then sets up an interstate distribution system to market the materials that he has illicitly produced, and furthermore uses this distribution system beyond a *de minimis* amount, is guilty of a different and more serious criminal offense.

**13.** *Bottone* stands for the proposition that intangible property may be "stolen" within the meaning of § 2314, even though in that case tangible property was stolen. The court's holding covered only the point that the transformation from stolen originals to copies did not bar

application of § 2314. Nonetheless, the court's language suggests that intangible stolen property can provide the basis for a violation of § 2314. The court stated that where no tangible object was stolen *or* transported across state lines, § 2314 is not violated. *Bottone, supra*, 365 F.2d at 393. Here, of course, the bootleg records were transported across state lines. The *Bottone* court explained that § 2314 "would presumably not extend to the case where a carefully guarded secret formula was memorized, carried away in the recesses of a theivish mind and placed in writing only after a boundary had been crossed." *Id.* This hypothetical clearly implies that only if the intangible property is stolen by memorization *and* transported similarly in intangible form is a violation of § 2314 avoided. The hypothetical implies that if the secret were placed in writing before the boundary was crossed, then the case would be different and a violation of § 2314 would be made out.

could cover the alleged actions of the defendant.[14]

As is indicated in portions of the definitions used by the *Smith* court, the statutory language "stolen" and "converted" covers a broad range of illegal acquisition and use of another's property. The phrase used by Congress in § 2314, "stolen, converted or taken by fraud," is clearly intended to offer a range of partly overlapping terms in order to cover illegal acquisitions and uses comprehensively. This was the finding of the court in *United States v. Plott,* 345 F.Supp. 1229 (S.D.N.Y.1972). The defendant was charged with the interstate transportation of alligators that were "poached and otherwise converted in violation of state and local law." *Id.* at 1231. The defendant argued that poaching was not stealing within the common law meaning of that word. *Id.* The court held that "stolen" in § 2314 had no restrictive common law meaning: "the words 'stolen' and 'converted' cover a broad range of wrongful acts." *Id.* Alternatively, the court found that poaching was stealing within even a narrow common law meaning. *Id.* at 1232.

The history of broadly interpreting the word "stolen" both in the NSPA and in its predecessor the National Motor Vehicle Theft Act, 18 U.S.C.A. § 2312 ("NMVTA") is long and well established. *United States v. Turley,* 352 U.S. 407, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957). Furthermore, the Supreme Court has held that the term "converted" is used to close "gaps or crevices" in a law. *Morissette v. United States,* 342 U.S. 246, 271, 72 S.Ct. 240, 254, 96 L.Ed. 288 (1952).

In countering this long history and this wide acceptance of a broad definition for the terms "stolen" and "converted", the *Smith* court advances two points from Congressional history that are relevant to interpreting this statute. First, Congress' primary purposes in passing the NSPA was to federalize crimes that otherwise would have been covered only by state criminal laws and were beyond the enforcement capabilities of state officials. *Smith, supra* at 244–46, *quoting* 78 Cong.Rec. 2947 (1934) (remarks of Homer Cummings, Attorney General). Federal law enforcement officials already enforce the copyright laws, so the NSPA is unnecessary to federalize copyright law. Second, in the comprehensive 1976 amendments to the Copyright Act, the *Smith* court argues, Congress specifically rejected a Senate provision to increase to felonies certain serious copyright violations involving interstate transportation. Legislative history further reveals that Congress was well informed of the dangers of larges-cale copyright violations and of interstate distribution systems for infringing goods, and yet specifically declined to make these

---

**14.** The *Smith* decision did not discuss earlier decisions of the Fifth Circuit that established a broad reading of the terms in question. In *Lyda v. United States,* 279 F.2d 461 (5th Cir. 1960), which held that embezzled property was covered by § 2314, the court discussed at length the need to interpret 'stolen' broadly:

This Court in an opinion which has received continued approbation long ago pointed out the broad meaning of 'stolen.' 'Stealing, having no common law definition to restrict its meaning as an offense, is commonly used to denote any dishonest transaction whereby one person obtains that which rightfully belongs to another, and deprives the owner of the rights and benefits of ownership, but may or may not involve the element of stealth usually attributed to the word purloin.' *Crabb v. Zerbst,* 5 Cir., 1938, 99 F.2d 562, 565.... The aim of the statute is, of course, to prohibit the use of interstate transportation facilities for goods having certain unlawful qualities. [footnote omitted]

*Id.* at 463–64. The *Lyda* court also quoted another Fifth Circuit opinion interpreting stolen as "a word of general and broad connotation, intended to cover and covering any criminal appropriation of another's property to the use of the taker...." *Id, quoting Edwards v. Bromberg,* 232 F.2d 107, 110 (5th Cir.1956).

These decisions were both affirmed by the Fifth Circuit in *United States v. McClain,* 545 F.2d 988 (5th Cir.1977), which held that property illegally exported from a foreign country could constitute the basis for a § 2314 violation (reversing lower court on the ground that it had not properly charged the jury as to the state of the foreign country's law). In *McClain* Judge Wisdom cited *Lyda* for the proposition "that § 2314 reflects a congressional purpose to reach all ways by which an owner is wrongfully deprived of the use or benefit of the use of his property." *Id.* at 995 n. 6.

**314**

actions felonies. *Id.* at 246–48. The 1982 amendments to the criminal laws regarding copyrights, however, indicate a Congressional change of heart. Counterfeiting and pirating were made felonies if they involved interstate commerce. On the other hand, there was no reference to bootlegging. 18 U.S.C. § 2318, Pub.L. No. 97–180, § 2, 96 Stat. 91 (amended May 24, 1982).

In sum, Congress evinced no specific intent with respect to whether § 2314 covers transportation of goods and wares embodying copyright-infringing works. Furthermore, including transportation of these articles in the scope of § 2314 would not further the major purpose of that section, which was to federalize through use of the commerce clause certain state crimes. In addition, Congress, in revising the copyright laws, it may be argued, implicitly intended that bootlegging should not be a felony even if it involves interstate commerce. On the other hand, courts have long given "stolen" and "converted" definitions broad enough to cover the instant alleged offenses, and many courts have interpreted § 2314 to cover these offenses.

This court declines to narrow the traditional reach of § 2314 by following a speculation as to the intent of Congress when a well established line of court interpretations holds that copyrights can be "stolen" or "converted" within the meaning of § 2314, especially since Congress has not acted to narrow those interpretations.[15] The indictment has properly alleged a violation of 18 U.S.C. § 2314.

## CONCLUSION

The defendant's motion to dismiss counts 19 through 27 of the indictment is denied. The defendant's motion to dismiss counts 1 through 18 of the indictment is granted.

**15.** Congressional inaction, though not decisive evidence of Congressional intent, is strongest where, as here, a consistent line of cases is established and Congress fails to change the courts' interpretation while it changes provisions in related statutes. *See generally Cheme-*

*huevi Tribe of Indians v. FPC,* 420 U.S. 395, 409–410, 95 S.Ct. 1066, 1074–1075, 43 L.Ed.2d 279 (1975); *Alabama Association of Insurance Agents v. Board of Governors of the Federal Reserve System,* 533 F.2d 224, 239–40 (5th Cir. 1976).